## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, and
THE NEW MEXICO ENVIRONMENT
DEPARTMENT,

        Plaintiffs,

        v.

HF SINCLAIR NAVAJO REFINING LLC,

        Defendant.

Civil Action No. 1:25-cv-00054

## COMPLAINT

Plaintiffs, the United States of America ("United States"), by authority of the Attorney General of the United States and acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the New Mexico Environment Department ("NMED"), by authority of the Attorney General of New Mexico, file this Complaint and allege as follows:

## NATURE OF ACTION

1. This is a civil action against HF Sinclair Navajo Refining LLC ("Defendant"), formerly HollyFrontier Navajo Refining LLC, pursuant to the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*, and the New Mexico Air Quality Control Act ("AQCA"), NMSA 1978, §§ 74-2-1 to 74-2-17 (1953 as amended through 2021).

2. Plaintiffs seek injunctive relief and civil penalties under Section 113 of the CAA, 42 U.S.C. § 7413, and Sections 74-2-12 and 74-2-12.1 of the AQCA, based on violations of the CAA and its implementing regulations and the AQCA and its implementing regulations, arising

from operations at Defendant's refinery located at 501 East Main Street, Artesia, New Mexico (the "Artesia Refinery").

3.      The Plaintiffs allege that Defendant has violated and/or continues to violate the following federal or state statutory or regulatory provisions in its ownership and operation of the Artesia Refinery, as set forth in this Complaint:

a.  Section 111 of the CAA, 42 U.S.C. § 7411, and its implementing regulations;

b.  The New Source Performance Standards ("NSPS") General Provisions, 40 C.F.R. Part 60, Subpart A ("NSPS Subpart A");

c.  The NSPS for Petroleum Refineries for Which Construction, Reconstruction, or Modification Commenced After May 14, 2007, 40 C.F.R. Part 60, Subpart Ja ("NSPS Subpart Ja");

d.  The NSPS for Volatile Organic Liquid Storage Vessels (including Petroleum Liquid Storage Vessels) for Which Construction, Reconstruction, or Modification Commenced After July 23, 1984, 40 C.F.R. Part 60, Subpart Kb ("NSPS Subpart Kb");

e.  The NSPS for Equipment Leaks of Volatile Organic Compound ("VOC") in Petroleum Refineries for Which Construction, Reconstruction, or Modification Commenced After November 7, 2006, 40 C.F.R. Part 60, Subpart GGGa ("NSPS Subpart GGGa");

f.  The NSPS for Standards of Performance for VOC Emissions from Petroleum Refinery Wastewater Systems, 40 C.F.R. Part 60, Subpart QQQ ("NSPS Subpart QQQ");

g.  Section 112 of the CAA, 42 U.S.C § 7412, and its implementing regulations;

     h.   The National Emission Standards for Hazardous Air Pollutants ("NESHAP") for Benzene Waste Operations, 40 C.F.R. Part 61, Subpart FF ("BWON");

     i.   The NESHAP for Petroleum Refineries, 40 C.F.R. Part 63, Subpart CC ("NESHAP Subpart CC");

     j.   The New Mexico State Implementation Plan ("SIP"), including Section 74-2-7 of the AQCA and its implementing regulations at Part 20.2.73 of the New Mexico Administrative Code ("NMAC") (Emissions Inventory Requirements).

     k.   The operating permit requirements under Title V of the CAA ("Title V"), 42 U.S.C. § 7661 *et seq.*, which are implemented and administered by NMED as codified in 20.2.70 NMAC.

4. Defendant's failure to comply with the applicable requirements of the CAA and its implementing regulations, and the AQCA and its implementing regulations, has resulted in unlawful emissions of VOCs, a precursor to ground-level ozone (often referred to as "smog"), sulfur dioxide ($SO_2$), a contributor to acid rain and a lung irritant, as well as benzene, a carcinogenic hazardous air pollutant.

**<u>JURISDICTION AND VENUE</u>**

5. The Court has jurisdiction over the CAA claims pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355.

6. This Court has supplemental jurisdiction over NMED's state law claims under the AQCA pursuant to 28 U.S.C. § 1367 because the NMED claims are so related to the claims in the United States' action that they form part of the same case or controversy.

7. Venue is proper in this District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because Defendant conducts business in this

District at the Artesia Refinery and the violations that constitute the basis for this Complaint occurred in this District.

## NOTICE

8.      Notice of the commencement of this action was given to Defendant and co-plaintiff NMED at least thirty (30) days prior to the filing of this Complaint under Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

## AUTHORITY

9.      The Attorney General has authority to bring this action on behalf of the Administrator of the EPA under 28 U.S.C. §§ 516 and 519, and under Section 305(a) of the CAA, 42 U.S.C. § 7605(a).

10.     The New Mexico Attorney General has authority to bring this action on behalf of the Secretary of NMED under Sections 74-2-12 and 74-2-12.1 of the AQCA.

## DEFENDANT

11.     Defendant is a Delaware limited liability corporation authorized to do business in New Mexico.

12.     Defendant is a wholly-owned subsidiary of HF Sinclair Corporation.

13.     At all times relevant to this Complaint, Defendant has been the owner or operator, within the meaning of Sections 111(a)(5) and 112(a)(9) of the CAA, 42 U.S.C. §§ 7411(a)(5) and 7412(a)(9), of the Artesia Refinery.

14.     Defendant is a "person" as defined in Section 302(e) of the CAA, 42 U.S.C. § 7602(e), and Section 74-2-2(O) of the AQCA.

## CLEAN AIR ACT ENFORCEMENT HISTORY

15.    Defendant is currently subject to a federal consent decree, *United States et al. v. Navajo Refining Company, L.P.*, Case No. CIV-01-1422LH (D.N.M.), entered on March 5, 2002 ("2002 Navajo CD"). The consent decree was negotiated as part of EPA's National Petroleum Refinery Initiative and resolved prior CAA violations at Defendant's Artesia Refinery, as well as its refinery located in Lovington, New Mexico.

16.    In July 2019, EPA began investigating the cause of high benzene levels reported from the Artesia Refinery's facility property boundary monitoring program ("fenceline monitoring" or "FLM"), pursuant to NESHAP Subpart CC.

17.    From October 1-4, 2019, EPA and NMED conducted an onsite inspection at the Artesia Refinery ("October 2019 inspection").

18.    From December 16-18, 2019, EPA and NMED conducted a follow-up site visit and tank inspection observation at the Artesia Refinery ("December 2019 site visit").

19.    While onsite at the Artesia Refinery, EPA and NMED inspectors used a forward looking infrared ("FLIR") camera and noted hydrocarbon emissions from several tanks and wastewater treatment system ("WWTS") equipment.

20.    EPA and NMED's inspection, site visit, and document review resulted in numerous areas of concern pertaining to the Artesia Refinery's equipment, control devices, operation, inspections, maintenance, permitting, and reporting.

21.    On May 1, 2020, EPA issued a Notice of Violation ("NOV") to Defendant for a subset of the claims in this case. The NOV alleged violations involving the Artesia Refinery's storage tanks, fenceline monitoring program, flares, and WWTS.

22.    On June 17, 2020, EPA hosted a NOV conference with Defendant and NMED to review the NOV violations.

23.     On September 16, 2020, EPA issued an Information Request pursuant to its authority under Section 114 of the CAA, 42 U.S.C. § 7414.  The Information Request focused on additional information needed to address EPA and NMED's findings during the site visits and issues discussed during the NOV conference.

24.     On May 12, 2021, EPA issued a second Information Request pursuant to its authority under Section 114 of the CAA, 42 U.S.C. § 7414.  The Information Request addressed additional issues observed during EPA and NMED's site visits and Defendant's determination that tanks at the Artesia Refinery contributed to elevated benzene readings under the NESHAP Subpart CC fenceline monitoring program.

25.     From June 6-7, 2023, EPA and NMED conducted a follow-up site visit and observed significant and ongoing noncompliance at the Artesia Refinery's WWTS equipment.

26.     In January 2024, Defendant initiated a third-party audit to evaluate the Artesia Refinery's total annual benzene calculation and compliance with NSPS Subpart QQQ and the emission control requirements of BWON with respect to certain process units, pursuant to the 2002 Navajo CD.

27.     In August 2024, Defendant completed a field verification of all individual drain system components at process units not covered by the third-party audit.

## THE ARTESIA REFINERY

28.     The Artesia Refinery's Standard Industrial Classification ("SIC") code is 2911 (Petroleum Refining) and North American Industrial Classification System ("NAICS") code is 324110 (Petroleum Refineries).

29.     The Artesia Refinery is a fully integrated petroleum refinery with one crude distillation unit and various downstream process units to produce petroleum products including

butane, propane, liquified petroleum gas, jet fuels, kerosene, diesel fuel, various grades of gasoline, carbon black oil, gas oils, fuel oils, asphalt, pitch, and molten sulfur to be sold as products.  The Artesia Refinery also produces refinery fuel gas, hydrogen, nitrogen, and steam for its own internal use.

30.     The equipment at the Artesia Refinery relevant to this Complaint include, *inter alia*, storage tanks that handle high, moderate, or low vapor pressure liquids; flares that control VOC emissions; and a wastewater system that collects and treats process wastewater and stormwater runoff from process units.

31.     The Artesia Refinery is a major source of hazardous air pollutants ("HAPs") as well as a major source for VOCs and $SO_2$.  As such, it is required to operate under a CAA Title V operating permit and a New Source Review permit.  The current Title V operating permit is P051-R3 issued by NMED on December 31, 2020.  The current New Source Review permit for the Artesia Refinery is PSD-NM-0195-M41 issued by NMED on July 22, 2024.

## STATUTORY AND REGULATORY BACKGROUND

32.     Section 101(b)(1) of the CAA, 42 U.S.C. § 7401(b)(1), states that one of the purposes of the CAA is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population[.]"

33.     Section 74-2-5(B)(1) of the AQCA requires the New Mexico Environmental Improvement Board to adopt regulations to "attain and maintain national ambient air quality standards and prevent or abate air pollution," as specified in the AQCA.  Pursuant to this directive, the Board has promulgated air quality regulations codified at Title 20, Chapter 2 of the NMAC.

## I.    New Source Performance Standards (40 C.F.R. Part 60)

34.    Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires EPA to publish and periodically revise a list of categories of "stationary sources" that, in EPA's judgment, cause or contribute significantly to air pollution and that may reasonably be anticipated to endanger public health or welfare.  Such categories typically correspond to distinct manufacturing processes or equipment with a given industry.

35.    After a category is included on the list described above, Section 111(b) of the CAA, 42 U.S.C. § 7411(b), authorizes EPA to promulgate standards of performance applicable to "new sources" within categories of sources that cause "air pollution which may reasonably be anticipated to endanger public health or welfare."  These regulations are referred to as NSPS and are located at 40 C.F.R. Part 60.

36.    Pursuant to Section 111(a)(5) of the CAA, 42 U.S.C. § 7411(a)(5), an "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

37.    Pursuant to Section 111(a)(3) of the CAA, 42 U.S.C. § 7411(a)(3), a "stationary source" is a building, structure, facility, or installation that emits or may emit any air pollutant.

38.    Pursuant to Section 111(a)(2) of the CAA, 42 U.S.C. § 7411(a)(2), a "new source" is any stationary source, the construction or modification of which is commenced after the promulgation of the standards of performance that will apply to such source.

39.    In 1979, EPA listed petroleum refineries as a source category under Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), that contributes significantly to air pollution and for which standards of performance would be established.  *See* 44 Fed. Reg. 49,222 (Aug. 21, 1979).

40.    Pursuant to Section 111(e) of the CAA, 42 U.S.C. 7411(e), it is unlawful for owners or operators of any new source to operate in violation of the NSPS after the effective date of the standards.

41.    EPA has delegated authority to New Mexico to implement and enforce all EPA-promulgated NSPS, as amended through January 2017, except 40 C.F.R. Part 60, Subpart AAA (Standards of Performance for New Residential Wood Heaters) and 40 C.F.R. Part 60, Subpart QQQQ (Standards of Performance for New Residential Hydronic Heaters and Forced-Air Furnaces).  *See* 40 C.F.R. § 60.4(e)(1).

**A.  NSPS Subpart A – General Provisions (40 C.F.R. §§ 60.1-60.19)**

42.    NSPS Subpart A contains general standards, including those related to the operation of air pollution control equipment, for facilities subject to a NSPS Subpart.

43.    Pursuant to 40 C.F.R. § 60.1, an owner or operator of an "affected facility," as defined under a NSPS Subpart, must comply with NSPS Subpart A.

44.    Pursuant to 40 C.F.R. § 60.2, an "affected facility" means, as it pertains to a stationary source, any apparatus to which a standard is applicable.  As discussed below, Defendant owns and operates affected facilities, as defined by NSPS QQQ, *inter alia*, and therefore must comply with NSPS Subpart A.

45.    Within NSPS Subpart A, EPA promulgated a regulation that applies at all times to affected facilities, including associated air pollution control equipment.  Specifically, "[a]t all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions."  40 C.F.R. § 60.11(d).

**B.  NSPS Subpart Ja – Petroleum Refineries (40 C.F.R. §§ 60.100a-60.109a)**

46.    Pursuant to Section 111 of the CAA, 42 U.S.C. § 7411, EPA promulgated the

NSPS for petroleum refineries in 40 C.F.R. Part 60, Subpart Ja, on June 24, 2008.  *See* 73 Fed.

Reg. 35,867 (Jun. 24, 2008).

47.    Pursuant to 40 C.F.R. § 60.100a(b), the NSPS Subpart Ja standards address

emissions of air pollutants from various affected facilities at petroleum refineries, including

flares, that commenced construction, modification, or reconstruction after June 24, 2008.

48.    Pursuant to 40 C.F.R. § 60.103a(f), modified flares subject to the applicability of

40 C.F.R. Part 60, Subpart J ("NSPS Subpart J") under a federal consent decree are required to

comply with 40 C.F.R. § 60.103a(h) by no later than November 11, 2015.

49.    Pursuant to 40 C.F.R. § 60.103a(h), owners or operators of any affected flare are

prohibited from burning in any affected flare any fuel gas that contains hydrogen sulfide

("$H_2S$") in excess of 162 parts per million by volume ("ppmv") determined hourly on a 3-hour

rolling average basis.  The combustion in a flare of process upset gases or fuel gas that is

released to the flare because of a relief valve leakage or other emergency malfunction is exempt

from that limit.  *See* 40. C.F.R. § 60.103a(h).

50.    Pursuant to 40 C.F.R. § 60.107a(a)(2), flares subject to NSPS Subpart Ja must

comply with the monitoring requirements of 40 C.F.R. § 60.107a(a).  These monitoring

requirements include the requirement to install, operate, calibrate, and maintain an instrument

for continuously monitoring and recording the concentration by volume (dry basis) of $H_2S$ in

the fuel gas being burned in the flare.  However, the owner or operator of a flare is not required

to comply with the monitoring requirements above for fuel gas streams combusted in a process

heater, other fuel gas combustion device, or flare that are inherently low in sulfur content.  *See* 40 C.F.R. § 60.107a(a)(3).

> ## C.  NSPS Subparts K, Ka, and Kb – Storage Vessels for Petroleum Liquids (40 C.F.R. §§ 60.110-60.113; 60.110a-60.115a; 60.110b-60.117b)

51.    Pursuant to Section 111 of the CAA, 42 U.S.C. § 7411, EPA promulgated the NSPS for storage vessels for petroleum liquids in 40 C.F.R. Part 60, Subparts K, Ka, and Kb prior to the NESHAP Subpart CC for petroleum refineries, discussed below.  *See* 39 Fed. Reg. 9,308 (Mar. 8, 1974), 45 Fed. Reg. 23,374 (Apr. 4, 1980), and 52 Fed. Reg. 11,420 (Apr. 8, 1987).  NESHAP Subpart CC provides that where it overlaps with NESHAP Subparts K, Ka, and Kb, each storage vessel is subject only to the requirements of the more stringent rule.  *See* 40 C.F.R. § 63.640(n).

52.    NSPS Subparts K, Ka, and Kb are applicable to storage vessels used to store petroleum or volatile organic liquids based on design capacity and the dates of construction, reconstruction, or modification of the storage vessels, as follows:  1) for NSPS Subpart K, after June 11, 1973, and prior to May 19, 1978; 2) for NSPS Subpart Ka, after May 18, 1978, and prior to July 23, 1984; and 3) for NSPS Subpart Kb, after July 23, 1984.

53.    Pursuant to 40 C.F.R. §§ 60.111(a) and 60.111a(a) in NSPS Subparts K and Ka, a "storage vessel" is defined as a "tank, reservoir, or container used for the storage of petroleum liquids. . .."

54.    Pursuant to 40 C.F.R. §§ 60.111(b) and 60.111a(b) in NSPS Subparts K and Ka, "petroleum liquids" are defined as "petroleum, condensate, and any finished or intermediate products manufactured in a petroleum refinery . . .."

55.     Pursuant to 40 C.F.R. § 60.111b in NSPS Subpart Kb, a "storage vessel" is defined as "each tank, reservoir, or container used for the storage of volatile organic liquids . . .."

56.     Pursuant to 40 C.F.R. § 60.111b in NSPS Subpart Kb, a "volatile organic liquid" is defined as "any organic liquid which can emit volatile organic compounds . . . into the atmosphere."

57.     Pursuant to 40 C.F.R. § 60.112b(a) in NSPS Subpart Kb, the owner or operator of each storage vessel that meets design capacity and maximum true vapor pressure criteria must equip the vessel with one of the control options provided in 40 C.F.R. § 60.112b(a)(1) – (4).  For storage vessels that are equipped with an external floating roof in accordance with 40 C.F.R. § 60.112b(a)(2), the owner or operator must conduct seal gap inspections in accordance with the procedures in 40 C.F.R. § 60.113b(b).

58.     40 C.F.R. § 60.113b(b)(2)(ii) in NSPS Subpart Kb specifies the procedures for owners or operators to first measure seal gap widths around the entire circumference of the tank in each place where a 0.32 cm diameter uniform probe passes freely (without forcing or binding against seal) between the seal and the wall of the storage vessel and then measure the circumferential distance of each such location.  40 C.F.R. § 60.113b(b)(2)(iii) describes the calculation method to determine the total area of the gap.

**D. NSPS Subparts GGG and GGGa – Equipment Leaks of VOC in Petroleum Refineries (40 C.F.R. §§ 60.590-60.593; 60.590a-60.593a)**

59.     Pursuant to Section 111 of the CAA, 42 U.S.C. § 7411, EPA promulgated the NSPS for equipment leaks of VOC in petroleum refineries at 40 C.F.R. Part 60, Subpart GGG on May 30, 1984.  *See* 49 Fed. Reg. 22,598 (May 30, 1984).

60.     NSPS Subpart GGG cross-references the requirements, specified source category-specific definitions, and exemptions of 40 C.F.R. Part 60, Subpart VV ("NSPS Subpart VV"), and specified source category-specific definitions and exemptions applicable to Subpart VV.

61.     Pursuant to Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), EPA promulgated revised standards for NSPS Subpart GGG on November 16, 2007. *See* 72 Fed. Reg. 64,860 (Nov. 16, 2007). The rules were revised to make NSPS Subpart GGG applicable to existing affected sources that commenced construction, reconstruction, or modification between January 4, 1983, and November 7, 2006. In the same rulemaking, EPA finalized new standards in NSPS Subpart GGGa that would apply only to affected sources that commenced construction, reconstruction, or modification after November 7, 2006. *See id.*

62.     NSPS Subpart GGGa cross-references the requirements of 40 C.F.R. Subpart VVa ("NSPS Subpart VVa"), which mirrors the NSPS Subpart VV standards but lowered the leak standards for pumps in light liquid service and valves in gas/vapor or light liquid service and included additional recordkeeping and instrument calibration requirements. *See id.*

63.     Pursuant to 40 C.F.R. §§ 60.590(a)(1) and 60.590a(a)(1), NSPS Subparts GGG and GGGa apply to affected facilities in petroleum refineries. The group of all equipment within a process unit is considered an affected facility. *See* 40 C.F.R. §§ 60.590(a)(3) and 60.590a(a)(3).

64.     Pursuant to 40 C.F.R. §§ 60.591 and 60.591a, "equipment" is defined as "each valve, pump, pressure relief device, sampling connection system, open-ended valve or line, and flange or other connector in VOC service."

65.     Pursuant to 40 C.F.R. §§ 60.590(e) and 60.590a(e), a "process unit" is defined as "components assembled to produce intermediate or final products from petroleum, unfinished petroleum derivatives, or other intermediates; a process unit can operate independently if supplied with sufficient feed or raw materials and sufficient storage facilities for the product."

66.     Pursuant to 40 C.F.R. §§ 60.592(a) and 60.592a(a), owner or operators subject to the provisions of NSPS Subparts GGG or GGGa must comply with the requirements of 40 C.F.R. §§ 60.482-1 to 60-482-10 of NPSP Subpart VV or 40 C.F.R. §§ 60.482-1a to 60.482-10a of NSPS Subpart VVa, respectively, as soon as practicable, but no later than 180 days after initial startup.

*Pumps*

67.     Pursuant to 40 C.F.R. § 60.482-2a(a)(1), "[e]ach pump in light liquid service shall be monitored monthly to detect leaks by the methods specified in § 60.485a(b), except as provided in § 60.482-1a(c) and (f) and paragraphs (d), (e), and (f) of this section."  40 C.F.R. § 60.482-2a(c)(2) states that "[a] first attempt at repair shall be made no later than 5 calendar days after each leak is detected."

68.     Pursuant to 40 C.F.R. § 60.482-2a(c)(1), "[w]hen a leak is detected, it shall be repaired as soon as practicable, but not later than 15 calendar days after it is detected, except as provided in § 60.482-9a."

69.     40 C.F.R. § 60.482-9a contains the requirements for placing leaking equipment on a delay of repair.  Pursuant to 40 C.F.R. § 60.482-9a(d), a delay of repair for pumps will be allowed for dual mechanical seal pumps, but the repair must be completed as soon as practicable but not later than six months after the leak was detected. *See* 40 C.F.R. § 60.482-9a(d).

70.     Pursuant to 40 C.F.R. § 60.482-2a(e)(2), any pump that is designed for no detectable emissions pursuant to 40 C.F.R. § 60.486a(e)(2)(i) must be operated with no detectable emissions, as indicated by an instrument reading of less than 500 ppm above background.

*Pressure Relief Devices in Gas/Vapor Service*

71.     Pursuant to 40 C.F.R. § 60.482-4a(a), "[e]xcept during pressure releases, each pressure relief device in gas/vapor service shall be operated with no detectable emissions, as indicated by an instrument reading of less than 500 ppm above background, as determined by the methods specified in § 60.485a(c)."

*Open-Ended Valves or Lines*

72.     Pursuant to 40 C.F.R. § 60.482-6a(a)(1), "[e]ach open-ended valve or line shall be equipped with a cap, blind flange, plug, or a second valve, except as provided in § 60.482-1a(c) and paragraphs (d) and (e) of this section."  40 C.F.R. § 60.481a defines "open-ended valve or line" to mean "any valve, except safety relief valves, having one side of the valve seat in contact with process fluid and one side open to the atmosphere, either directly or through open piping."

*Valves*

73.     Pursuant to 40 C.F.R. § 60.592a(a), Defendant must comply with 40 C.F.R. § 60.482-7a(2), which states that "[a] valve that begins operation in gas/vapor service or light liquid service after the initial startup date for the process unit must be monitored according to paragraphs (a)(2)(i) or (ii), except for a valve that replaces a leaking valve and except as provided in paragraphs (f), (g), and (h) of this section, § 60.482-1a(c), and §§ 60.483-1a and 60.483-2a."

74.     Pursuant to 40 C.F.R. § 60.482-7a(a)(2)(i), the valve should be monitored by the methods specified in 40 C.F.R. § 60.485a(b) for the first time within 30 days after the end of the startup period to ensure proper installation.  40 C.F.R. § 60.485a(b)(1) requires owners or operators to determine compliance with the standards in 40 C.F.R. § 60.482-7a(2)(i) using Method 21 to identify the presence of leaking sources.

75.     Pursuant to 40 C.F.R. § 60.482-7a(a)(1), "[e]ach valve shall be monitored monthly to detect leaks by the methods specified in § 60.485a(b) and shall comply with paragraphs (b) through (e) of this section, except as provided in paragraphs (f), (g), and (h) of this section, § 60.482-1a(c) and (f), and §§ 60.483-1a and 60.483-2a."

76.     Pursuant to 40 C.F.R. § 60.482-7a(d)(2), a "first attempt at repair shall be made no later than 5 calendar days after each leak is detected."

77.     Pursuant to 40 C.F.R. § 60.482-7a(c)(1)(i), "[a]ny valve for which a leak is not detected for 2 successive months may be monitored the first month of every quarter, beginning with the next quarter, until a leak is detected."  As an alternative to monitoring all the valves in the first month of the quarter in accordance with 40 C.F.R. § 60.482-7a(c)(1)(i), an owner or operator can choose to subdivide the process unit into two or three subgroups of valves and monitor each subgroup in a different month during the quarter, as long as each subgroup is monitored every three months and the owner or operator keeps records of the valves assigned to each subgroup.  40 C.F.R. § 60.482-7a(c)(1)(ii).

78.     Pursuant to 40 C.F.R. § 60.485a(b)(1), owners or operators are required to determine compliance with the standards in 40 C.F.R. § 60.482-7a(c)(1) using Method 21 to identify the presence of leaking sources.

79.    Pursuant to 40 C.F.R. § 60.482-7a(d)(1), "[w]hen a leak is detected, it shall be repaired as soon as practicable, but no later than 15 calendar days after the leak is detected, except as provided in § 60.482-9a."  40 C.F.R. § 60.482-9a provides the requirements for placing leaking components on a delay of repair.

80.    Pursuant to 40 C.F.R. § 60.482-7a(f)(2), any valve that is designated for no detectable emissions pursuant to 40 C.F.R. § 60.486a(e)(2)(i) must be operated with no detectable emissions, as indicated by an instrument reading of less than 500 ppm above background.

### *Closed Vent Systems and Control Devices*

81.    Pursuant to 40 C.F.R. § 60.592a(a), an owner or operator must comply with 40 C.F.R. § 60.482-10a(f), which states that "[e]xcept as provided in paragraphs (i) through (k) of this section, each closed vent system shall be inspected according to the procedures and schedule specified in paragraphs (f)(1) and (2) of this section."

82.    Pursuant to 40 C.F.R. § 60.482-10a(f)(1)(i), an owner or operator of a closed vent system that is constructed of hard piping is required to conduct an initial inspection according to the procedures in 40 C.F.R. § 60.485a(b).  40 C.F.R. § 60.485a(b)(1) requires owners or operators to determine compliance with the standards in 40 C.F.R. § 60.482-10a(f) using Method 21 to identify the presence of leaking sources.

### E.  NSPS Subpart QQQ – VOC Emissions from Petroleum Refinery Wastewater Systems (40 C.F.R. §§ 60.690-60.699)

83.    Pursuant to Section 111 of the CAA, 42 U.S.C. § 7411, EPA promulgated the NSPS for VOC emissions from petroleum refinery wastewater systems at 40 C.F.R. Part 60, Subpart QQQ, on November 23, 1988.  *See* 53 Fed. Reg. 47,616 (Nov. 23, 1988).

17

84.     The NSPS Subpart QQQ standards control VOC emissions from petroleum refinery wastewater systems through a combination of equipment, work practice, design, and operational standards.  The emission points regulated under the NSPS Subpart QQQ include, *inter alia*, drain openings, junction box covers, sewer lines, oil-water separators, and VOC control devices.

85.     Due to the interrelatedness of various sources of VOC emission at petroleum refineries, the definition of "affected facilities" includes a combination of regulated individual emission sources and groups of emission sources that are operated in conjunction with one another.  *See* 52 Fed. Reg. 16,334, 16,335 (May 4, 1987); *see also* 40 C.F.R. § 60.2.

86.     While federal applicability under NSPS Subpart QQQ is typically established pursuant to 40 C.F.R. § 60.690(a)(1), Defendant accepted federal applicability at the Artesia Refinery's WWTS in the 2002 Navajo CD.

87.     An "individual drain system" is a separate affected facility subject to the requirement of NSPS Subpart QQQ.  Pursuant to 40 C.F.R. § 60.691, an "individual drain system" means all process drains connected to the first common junction box and includes all such drains and common junction box, together with their associated sewer lines and other junction boxes, down to the receiving oil-water separator.

88.     An "individual drain system" may have a "catch basin," defined in 40 C.F.R. § 60.691 to mean an "open basin which serves as a single collection point for stormwater runoff received directly from refinery surfaces and for refinery wastewater from process drains."

89.     The components of individual drain systems are required to meet the applicable standards at 40 C.F.R. § 60.692-2 for drains, junction boxes, and sewer lines.

90.     Pursuant to 40 C.F.R. § 60.692-2(a)(1), each drain within an individual drain system must be equipped with water seal control, defined in 40 C.F.R. § 60.691 to mean a seal pot, p-leg trap, or other type of trap filled with water that has a design capability to create a water barrier between the sewer and the atmosphere.

91.     Pursuant to 40 C.F.R. § 60.692-2(a)(5), whenever low water levels or missing or improperly installed caps or plugs are identified, water must be added or first efforts at repair must be made as soon as practicable, but not later than 24 hours after detection.

92.     Pursuant to 40 C.F.R. § 60.691, an "oil-water separator" is defined as wastewater treatment equipment that separates oil from water and consists of a separation tank, including the forebay and other separator basins, skimmer, weirs, grit chambers, and sludge hoppers.  The term incorporates slop oil facilities, including tanks, together with storage vessels and auxiliary equipment located between individual drain systems and the oil-water separator.

93.     Pursuant to 40 C.F.R. § 60.692-3(b), each oil-water separator tank or auxiliary equipment with a design capacity to treat more than 16 liters per second (250 gallons per minute (gpm)) of refinery wastewater must be equipped and operated with a closed vent system and control device, which meets the requirements of 40 C.F.R. § 60.692-5.

94.     Pursuant to 40 C.F.R. § 60.691, a "closed vent system" is defined as a system that is not open to the atmosphere and that is composed of piping, connections, and, if necessary, flow-inducing devices that transport gas or vapor from an emission source to a control device.  If gas or vapor from regulated equipment are routed to a process (*e.g.*, petroleum refinery fuel gas system), the process is not considered a closed vent system and is not subject to the closed vent system standards.

95.    Pursuant to 40 C.F.R. § 60.692-5(e)(1), closed vent systems are required to be designed and operated with no detectable emission, as indicated by an instrument reading of less than 500 parts per million ("ppm") above background.

96.    Pursuant to 40 C.F.R. § 60.691, a "control device" is defined as an enclosed combustion device, vapor recovery system, or flare.  All vapor recovery systems (*e.g.*, condensers and adsorbers) must be designed and operated to achieve 95 percent recovery of the VOCs or greater.  *See* 40 C.F.R. § 60.692-5(a).

97.    Pursuant to 40 C.F.R. § 60.692-5(e)(3), the owner or operator must install a flow indicator on a vent stream to a control device for VOC emissions to ensure that vapors are being routed to the control device.

98.    Pursuant to 40 C.F.R. § 60.692-3(a), equipment subject to NSPS Subpart QQQ, including each oil-water separator tank, slop oil tank, storage vessel or auxiliary equipment, must be equipped and operated with a fixed roof.  A "fixed roof" means a cover that is mounted to a tank or chamber in a stationary manner, and which does not move with fluctuation in wastewater levels.  *See* 40 C.F.R. § 60.691.

99.    Pursuant to 40 C.F.R. § 60.692-3(a)(3), if the fixed roof has access doors or openings, each such door or opening must be gasketed, latched, and kept closed at all times during operation of the separator system, except during inspection and maintenance.

100.    Pursuant to 40 C.F.R. § 60.692-3(a)(5), when a broken seal or gasket or other problem is identified on an oil-water separator, first efforts at repair must be made as soon as practicable, but not later than 15 calendars after it was identified, except as provided in 40 C.F.R. § 60.692-6.

101.    Each owner or operator of a facility subject to the provisions of NSPS Subpart

QQQ must comply with the recordkeeping requirements of 40 C.F.R. § 60.697.  Pursuant to 40

C.F.R. § 60.697(a), all records must be retained for a period of two years after being recorded

unless otherwise noted in the standards.

102.    Pursuant to 40 C.F.R. § 60.697(f)(1), during the life of the source, a copy of the

design specifications for all equipment used to comply with the provisions of NSPS Subpart

QQQ must be kept in a readily accessible location.

**II.    National Emission Standards for Hazardous Air Pollutants (40 C.F.R. Part 61)**

103.    As enacted in 1970 and prior to the 1990 CAA amendment, Section 112 of the

CAA, 42 U.S.C. § 7412, required EPA to publish a list of hazardous air pollutants and establish

standards for those pollutants that provide an ample margin of safety to protect public health.

104.    Pursuant to 40 C.F.R. § 61.02, an "owner or operator" is defined as "any person

who owns, leases, operates, controls, or supervises a stationary source."

105.    Pursuant to 40 C.F.R. § 61.02, a "stationary source" is defined as "any building,

structure, facility, or installation which emits or may emit any air pollutant which has been

designated as hazardous by the Administrator."

**BWON (40 C.F.R. §§ 61.340-61.359)**

106.    On June 8, 1977, EPA listed benzene as a HAP.  *See* 42 Fed. Reg. 29,332 (Jun. 8,

1977).

107.    Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated

BWON at 40 C.F.R. Part 61, Subpart FF, on March 7, 1990.  *See* 55 Fed. Reg. 8292 (Mar. 7,

1990).  BWON provides standards for the management and control of benzene waste based on

total annual benzene ("TAB") quantity.

108.    Pursuant to 40 C.F.R. § 61.340(a), BWON is applicable to owners and operators of petroleum refineries, among other sources.

109.    Pursuant to 40 C.F.R. § 61.341, a "petroleum refinery" is defined as "any facility engaged in producing gasoline, kerosene, distillate fuel oils, residual fuel oils, lubricants, or other products through the distillation of petroleum, or through the redistillation, cracking, or reforming of unfinished petroleum derivatives."

110.    Pursuant to 40 C.F.R. § 61.341, "petroleum" is defined as "the crude oil removed from the earth and the oils derived from tar sands, shale, and coal."

111.    Pursuant to 40 C.F.R. § 61.341, "waste" is defined as "any material resulting from industrial, commercial, mining or agricultural operations, or from community activities that is discarded or is being accumulated, stored, or physically, chemically, thermally, or biologically treated prior to being discarded, recycled, or discharged." "Waste stream" is defined to mean "the waste generated by a particular process unit, product tank, or waste management unit. The characteristics of the waste stream (e.g., flow rate, benzene concentration, water content) are determined at the point of waste generation." *See* 40 C.F.R. § 61.341.

112.    An owner or operator of a petroleum refinery is required to determine the TAB quantity from facility waste using the procedure in 40 C.F.R. § 61.355(a). If the TAB quantity from facility waste is equal to or greater than 10 Mg/year (11 ton/year), then the owner or operator shall comply with the requirements of 40 C.F.R. §§ 61.342(c), (d), or (e). 40 C.F.R. § 61.355(a)(3).

113.    Under the control option known as the "6 BQ Compliance Option," a facility must control all benzene-containing wastes except for up to 6.0 Mg/year of aqueous benzene-containing wastes. 40 C.F.R. § 61.342(e).

114.    Owners and operators must calculate the benzene quantity for controlled and uncontrolled waste streams to evaluate their compliance with the 6 BQ Compliance Option. 40 C.F.R. §§ 61.342(e)(2), 61.355(k).

115.    If the TAB quantity from facility waste is equal to or greater than 10 Mg/year (11 ton/year), and the owner or operator is complying with the 6 BQ Compliance Option, the owner or operator is required to submit information for each controlled or uncontrolled waste stream in the annual reports required under 40 C.F.R. § 61.357(d)(2). 40 C.F.R. § 61.357(d)(5).

116.    Owners and operators must ensure that the following control equipment is designed to operate with the no detectable emissions standard set forth in BWON, defined as a reading of less than 500 parts per million by volume ("ppmv") above background: the cover and all openings on each drain system opening and the cover and all openings on the fixed-roof for each oil water separator. 40 C.F.R. §§ 61.346(a)(1)(i)(A), 61.347(a)(1)(i)(A).

III.    **National Emission Standards for Hazardous Air Pollutants for Source Categories (40 C.F.R. Part 63)**

117.    Section 112(c) of the CAA, 42 U.S.C. § 7412(c), requires EPA to publish a list of categories and subcategories of major sources of HAPs.

118.    Section 112(d) of the CAA, 42 U.S.C. § 7412(d), requires EPA to establish technology-based NESHAPs for each listed source category.  Each NESHAP requires the maximum degree of reduction in emissions of HAPs determined to be achievable through the application of measures, processes, methods, systems, or techniques including, but not limited to, the enclosure of systems or processes to eliminate emissions, and design, equipment, work practice, or other operational standards.  *See* 42 U.S.C. § 7412(c)(1) – (2), (d)(1) – (2).  The NESHAPs for source categories are located at 40 C.F.R. Part 63.

**NESHAP Subpart CC – Petroleum Refineries (40 C.F.R. §§ 63.640-63.671)**

119.    Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated NESHAPs from petroleum refineries at 40 C.F.R. Part 63, Subpart CC, on August 18, 1995. *See* 60 Fed. Reg. 43,224 (Aug. 18, 1995).

120.    Pursuant to Sections 112(d)(6) and 112(f) of the CAA, 42 U.S.C. §§ 7412(d)(6) and (f), EPA promulgated a revised rule on December 1, 2015, in accordance with its requirement to review and revise the standards, if necessary, to account for improvements in air pollution control technologies and any remaining health risks from the source category.  *See* 80 Fed. Reg. 75,178 (Dec. 1, 2015).

121.    Pursuant to 40 C.F.R. § 63.641, the NESHAP Subpart CC rules apply to petroleum refinery processing units and related "emission points," which can include flares, storage vessels, wastewater streams, and equipment leaks.

122.     Pursuant to 40 C.F.R. § 63.641, a "petroleum refining process unit" means a process unit used in an establishment primarily engaged in petroleum refining as defined in the SIC Code for petroleum refining (2911) and used for (a) producing transportation fuels, heating fuels, or lubricants, (b) separating petroleum, or (c) separating, cracking, reacting, or reforming intermediate petroleum streams.

123.     Pursuant to 40 C.F.R. § 63.640(n) – (s), EPA clarified the applicability of NESHAP Subpart CC to emission points that may be subject to other existing and overlapping NSPS and NESHAP regulations.  *See* 60 Fed. Reg. 43,244 (Aug. 18, 1995).

124.     Pursuant to 40 C.F.R. § 63.99(a)(32)(i), EPA has delegated authority to NMED to implement and enforce NESHAP Subpart CC.

125.     Section 112(i)(3) of the CAA, 42 U.S.C. § 7412(i)(3) prohibits any person from operating an existing source in violation of a NESHAP after the effective date of the NESHAP applicable to that source.

126.     Pursuant to 40 C.F.R. § 63.642(n), "[a]t all times, the owner or operator must operate and maintain any affected source, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions."

### *Fenceline Monitoring*

127.     Pursuant to 40 C.F.R. § 63.658(a) – (b), the owner or operator of the affected source is required to conduct air sampling along the facility property boundary and analyze the samples for benzene.  *See* NESHAP Subpart CC Table 11.

128.     Pursuant to 40 C.F.R. § 63.658(c), owners and operators must locate a network of passive air monitors around the facility property boundary.

129.    Pursuant to 40 C.F.R. § 63.658(e)(1), a sample from each monitor must be collected every 14 days.

130.    Pursuant to 40 C.F.R. § 63.658(f), the owner or operator must determine whether the sampling results are above or below the action level for benzene within 45 days of the completion of each 14-day sampling period for each passive air monitor.  The first step in making this determination is to determine the facility impact on the benzene calculation for the 14-day sampling period ("14-day $\Delta c$"), pursuant to 40 C.F.R. § 63.658(f)(1).  To do this, the owner or operator calculates the annual average $\Delta c$ based on the average of the 14-day $\Delta c$ for the 26 most recent 14-day sampling periods, pursuant to 40 C.F.R. § 63.658(f)(2).  Then, the owner or operator compares the annual average $\Delta c$ to the action level for benzene of nine (9) micrograms per cubic meter ($\mu g/m^3$), pursuant to 40 C.F.R. § 63.658(f)(3).

131.    Pursuant to 40 C.F.R. § 63.655(h), owners and operator must report the individual 14-day sample results for each monitor, the 14-day $\Delta c$, and the annual average $\Delta c$.

132.    If the annual average $\Delta c$ for benzene is less than or equal to 9 $\mu g/m^3$, the concentration is below the action level.  If the annual average $\Delta c$ for benzene is greater than 9 $\mu g/m^3$, the concentration is above the action level, and the owner or operator must conduct a root cause analysis and corrective action to reduce fenceline concentrations below the action level.  *See* 40 C.F.R. § 63.658(f)(3), (g), and (h).

### *Storage Vessels*

133.    Pursuant to 40 C.F.R. § 63.641, a "storage vessel" means a tank or other vessel that is used to store organic liquids.

134.    Pursuant to 40 C.F.R. § 63.641, a "Group 1 storage vessel" includes a storage vessel at an existing source that has a design capacity greater than or equal to 151 cubic meters

26

(40,000 gallons) and stored liquid maximum true vapor pressure greater than or equal to 5.2 kilopascals (0.75 pounds per square inch), and annual average HAP liquid concentration greater than four percent by weight total organic HAP.

135.    Pursuant to 40 C.F.R. § 63.641, a "Group 2 storage vessel" includes a storage vessel that does not meet the definition of a Group 1 storage vessel.

136.    Pursuant to 40 C.F.R. § 63.641, "maximum true vapor pressure" means the equilibrium partial pressure exerted by the stored liquid at the temperature equal to the highest calendar-month average of the liquid storage temperature for liquids stored above or below the ambient temperature or at the local maximum monthly average temperature as reported by the National Weather Service for liquids stored at the ambient temperature as determined by one of the methods identified in 40 C.F.R. § 63.641.

137.    Pursuant to 40 C.F.R. § 63.660, the owner or operator of a Group 1 storage vessel storing liquid with a maximum true vapor pressure greater than or equal to 11.1 pounds per square inch absolute (psia) that is part of a new or existing source must comply with National Emission Standards for Closed Vent Systems, Control Devices, Recovery Devices, and Routing to a Fuel Gas System or a Process, located at 40 C.F.R. Part 63, Subpart SS ("NESHAP Subpart SS").  These provisions apply when another subpart, such as NESHAP Subpart CC, references the use of NESHAP Subpart SS for air emission control.  *See* 40 C.F.R. § 63.980.

138.    Pursuant to 40 C.F.R. § 63.660, the owner or operator of a Group 1 storage vessel storing liquid with a maximum true vapor pressure less than 11.1 psia must comply at that vessel with either NESHAP Subpart SS or the National Emission Standards for Storage Vessels (Tanks) – Control Level 2, located at 40 C.F.R. Part 63, Subpart WW ("NESHAP Subpart WW").

139.    Pursuant to 40 C.F.R. § 63.1060, NESHAP Subpart WW applies when another NESHAP subpart, such as NESHAP Subpart CC, references the use of NESHAP Subpart WW for air emission control.

140.    For each storage vessel where the owner or operator elects to comply with NESHAP Subpart WW, the storage vessel must be operated and maintained with an internal floating roof, an external floating roof, or an equivalent requirement after the vessel's compliance due date.  *See* 40 C.F.R. § 63.1062(a).

141.    An owner or operator who elects to use a floating roof to comply with 40 C.F.R. § 63.1062(a) is required to comply with 40 C.F.R. § 63.1063(a) – (e).  *See* 40 C.F.R. § 1063.

142.    Pursuant to 40 C.F.R. § 63.1063(a)(2), openings through the deck of a floating roof must be equipped with deck fittings as required in 40 C.F.R. § 63.1063(a)(2)(i) –(viii). Floating roof tanks must meet these requirements based on when the tanks are completely emptied and degassed, or by January 30, 2026, whichever occurs first if they are not meeting the requirements as of June 30, 2014.  *See* 40 C.F.R. § 63.660(b).

143.    Pursuant to 40 C.F.R. § 63.1063(b)(1), the floating roof must float on the stored liquid surface at all times.

144.    Pursuant to 40 C.F.R. § 60.1063(d)(3), the owner or operator of external floating roof tanks must conduct seal gap inspections to determine the presence and size of gaps between the rim seals and the wall of the storage vessel.  40 C.F.R. § 63.1063(d)(3)(i)(A) –(F) specifies the procedure for measuring the seal gap size in each place where a 0.32 cm diameter uniform probe passes freely between the seal and vessel wall.  Pursuant to 40 C.F.R. § 63.1063(d)(3)(i)(E), the area of the gap is the product of the gap length and average gap width.

*Flares*

145.    Pursuant to 40 C.F.R. § 63.670(e), the owner or operator of a flare used as a control device for emission points subject to NESHAP Subpart CC must operate the flares to maintain the net heating value of the flare combustion zone gas (NHVcz) at or above 270 British thermal units per standard cubic feet (Btu/scf) determined on a 15-minute block period basis when regulated material is routed to the flare for at least 15 minutes.

## IV.    State Implementation Plan

146.    Section 108(a) of the CAA, 42 U.S.C. § 7408(a), requires the EPA Administrator to identify and prepare air quality criteria for each air pollutant the emission of which may endanger public health or welfare, and the presence of which results from numerous or diverse mobile or stationary sources.  For each such "criteria" pollutant, Section 109 of the CAA, 42 U.S.C. § 7409, requires EPA to promulgate National Ambient Air Quality Standards ("NAAQS") for such pollutants in the ambient air that are requisite to protect the public health and welfare.  The NAAQS are in the form of maximum allowable concentrations in the ambient air during a specified period and are designed to protect the most sensitive individuals from harm from airborne pollutants.

147.    Pursuant to Sections 108 and 109 of the CAA, 42 U.S.C. §§ 7408 and 7409, EPA has identified ozone as a criteria pollutant and has promulgated NAAQS for ozone.  *See* 40 C.F.R. Part 50.  Unlike the other criteria pollutants, ozone is not directly emitted but instead is formed in the atmosphere through photochemical reactions involving VOCs and oxides of nitrogen ("NOx") in the presence of sunlight.  Thus, VOCs and NOx are subject to regulation as part of the NAAQS for ozone.  *See* 40 C.F.R. §§ 50.6 to 50.11.

148.    Pursuant to Section 107(d) of the CAA, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality either meets or does not meet the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  Following promulgation of a new or revised NAAQS, EPA is required to designate all areas within each state as in attainment, nonattainment, or unclassifiable for the standard within two years.  *See* 42 U.S.C. § 7407(d).  If the concentrations of a criteria pollutant in a geographic area meet or fall below the NAAQS, the area is designated as in "attainment" of the standard.  Areas that exceed the NAAQS are designated as "nonattainment" areas.  Areas that do not have monitoring data available are designated as "attainment/unclassifiable" or "unclassifiable."

149.    Section 110(a) of the CAA, 42 U.S.C. § 7410(a), requires each state to adopt and submit to the Administrator of the EPA a plan that provides for implementation, maintenance, and enforcement for each promulgated NAAQS, in each air quality control region (or portion thereof).  Each such plan, known as a SIP, must include enforceable emissions limitations and other control measures as well as a permit program to regulate the modification and construction of any stationary source within the areas covered by the plan as necessary to ensure that NAAQSs are achieved.  *See* 42 U.S.C. § 7410(a)(2)(A).  The SIP must also provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to monitor, compile, and analyze data on ambient air quality and, upon request, make such data available to EPA.  *See* 42 U.S.C. § 7410(a)(2)(B).

150.    Pursuant to Section 113(a) and (b) of the CAA, 42 U.S.C. § 7413(a) and (b), upon EPA approval, SIP requirements are federally enforceable.  Under 40 C.F.R. § 52.23, any permit limitation or condition contained within a permit issued under an EPA-approved

program that is incorporated in a SIP is a requirement of the SIP and is enforceable under Section 113 of the CAA.

### 20.2.73 NMAC – Notice of Intent and Emission Inventory Requirements

151.    Pursuant to Section 110 of the CAA, 42 U.S.C. § 7410, the State of New Mexico adopted regulations comprising the New Mexico SIP.  The New Mexico SIP regulations, as approved by EPA, are set forth in 40 C.F.R. § 52.1620(c).

152.    The New Mexico SIP regulations governing emission inventory requirements are codified at 20.2.73 NMAC.  *See* 62 Fed. Reg. 50,514 (Sep. 26, 1997) (approving regulations as part of the New Mexico SIP, to replace previously approved requirements codified in the New Mexico Air Quality Control Regulations § 703); 77 Fed. Reg. 70,693 (Nov. 27, 2012) (approving revisions).

153.    Pursuant to 20.2.73.6 NMAC, the objective of 20.2.73 NMAC is to "establish requirements for the submission of certain relevant information to ensure that the regulations and standards under the Air Quality Control Act and the federal act will not be violated, and to facilitate the quantification of greenhouse gas emissions in New Mexico."

154.    Pursuant to 20.2.73.7(E) NMAC, "emission report or inventory" means "a listing, by source, of the amount of air pollutants discharged into the atmosphere of a community."

155.    Pursuant to 20.2.73.7(K) NMAC, "operator" means "the person or persons responsible for the overall operation of a facility."

156.    Pursuant to 20.2.73.7(L) NMAC, "owner" means "the person or persons who own a facility or part of a facility."

157.    Pursuant to 20.2.73.7(S) NMAC, "stationary source" or "source" means "any building, structure, equipment, facility, installation (including temporary installations), operation or portable stationary source which emits or may emit any air contaminant. . .."

158.    Pursuant to 20.2.73.300(A)(1) – (3) NMAC, the "requirements of 20.2.73.300 NMAC apply to the owner or operator of any stationary sources located outside of Bernalillo County that:

>       (1) has been issued a permit under 20.2.72 NMAC (Construction Permits) during any period of time, except for toxic air pollutant permits issued under Sections 401 to 499 of 20.2.72 NMAC;
>
>       (2) is required to file a notice of intent under 20.2.73.200 NMAC; or
>
>       (3) emits in excess of 1 ton of lead or 10 tons of total suspended particulate, $PM_{10}$, $PM_{2.5}$, sulfur dioxide, nitrogen oxides, carbon monoxide, or volatile organic compounds in any calendar including and subsequent to 1990."

159.    Pursuant to 20.2.73.300(B)(1)-(3), the following sources are required to comply with the reporting obligations:

>       "(1) Any source which emits, or has the potential to emit, 5 tons per year or more of lead or lead compounds, or 100 tons per year or more of $PM_{10}$, $PM_{2.5}$, sulfur oxides, nitrogen oxides, carbon monoxide, or volatile organic compounds shall submit an emissions report annually.
>
>       (2) Any source defined as a major source of hazardous air pollutants under 20.2.70 NMAC (Operating Permits) shall submit an emission report annually.

(3) Any source which is located in an ozone nonattainment area and which

emits, or has the potential to emit, 25 tons per year or more of nitrogen oxides

or volatile organic compounds shall submit an emissions report annually."

160.    Sources for which a date for submitting an annual emission report is specified in

a current operating permit issued under 20.2.70 NMAC (Operating Permits) must submit such

report on that date.  *See* 20.2.73.300(B)(8) NMAC.

161.    Pursuant to 20.2.73.300(C)(5)(d) NMAC, the emissions report must contain an

estimate of actual emissions for each emission point, including fugitive emissions and emissions

occurring during maintenance, start-ups, shutdowns, upsets, and downtime of total suspended

particulate, $PM_{10}$, $PM_{2.5}$, ammonia, sulfur oxides, nitrogen oxides, carbon monoxide, volatile

organic compounds, and lead in tons per year and a description of the methods utilized to make

such estimates, including calculations.

**V.    Title V Operating Permit Requirements**

162.    Title V of the CAA, 42 U.S.C. §§ 7661 – 7661f, requires EPA to promulgate

regulations that require and specify the minimum elements of state operating permit programs.

On July 21, 1992, EPA published a final rule establishing a comprehensive state air quality

permitting system consistent with the requirements of Title V of the CAA.  *See* 57 Fed. Reg.

32,295 (Jul. 21, 1992).

163.    Section 501 of the CAA, 42 U.S.C. § 7661, defines a "major source" as any

stationary source (or group of stationary sources located within a contiguous area and under

common control) that is either:

A "major source" as defined in Section 112 of the CAA, 42 U.S.C. § 7412,

*i.e.*, "any stationary source or group of stationary sources located within a

33

contiguous area and under common control that emits or has the potential to

emit considering controls, in the aggregate, 10 tons per year or more of any

hazardous air pollutant or 25 tons per year or more of any combination of

hazardous air pollutants[,]" or

A "major stationary source" as defined in Section 302 of the CAA, 42 U.S.C.

§ 7602, *i.e.*, "any stationary facility or source of air pollutants which directly

emits, or has the potential to emit, one hundred tons per year or more of any

air pollutant."

164.    Section 502 of the CAA, 42 U.S.C. § 7661a, establishes requirements for

specified sources to obtain operating permits ("Title V operating permits"), and sets forth the

minimum elements for such permits.  42 U.S.C. § 7661a.

165.    Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and the implementing

regulations at 40 C.F.R. § 70.7(b), provide that, after the effective date of the state Title V

permit program, no person may violate any requirement of a Title V permit or operate a source

subject to a Title V permit except in compliance with a permit issued by a permitting authority

under Title V of the CAA.

166.    Each term and condition of a Title V permit, including any provisions designed

to limit a source's potential to emit, are federally enforceable unless specifically designated in

the permit as not being federally enforceable.  *See* 40 C.F.R. § 70.6(b).

167.    Section 503(c) of the CAA, 42 U.S.C. § 7661b(c), and the implementing

regulations at 40 C.F.R. § 70.5(a) and (c), set forth the requirement to submit a timely, accurate,

and complete application for a Title V operating permit, and specifies information required to be

submitted with the application.

168.    Section 504(a) of the CAA, 42 U.S.C. § 7661c(a), and the implementing regulations at 40 C.F.R. § 70.6(a) and (c), require that each Title V operating permit include enforceable emission limitations and standards, a schedule of compliance, and other conditions necessary to assure compliance with applicable requirements, including those contained in a SIP.

169.    The CAA Title V operating permit program is implemented and administered by the States.  Accordingly, Section 502 of the CAA requires each State to develop and submit for EPA approval a permit program meeting the requirements of Title V of the CAA.  42 U.S.C. § 7661a.

170.    EPA fully approved the New Mexico Title V operating permit program effective as of January 27, 1997.  61 Fed. Reg. 60,032 (Nov. 26, 1996).

171.    The New Mexico air quality regulations implementing the Title V operating permit program are codified at 20.2.70 NMAC.

172.    The requirements of 20.2.70 NMAC apply to all persons who own or operate a major source.

173.    Pursuant to 20.2.70.7(R) NMAC, a "major source" is defined as the term is defined in Section 501 of the CAA, 42 U.S.C. § 7661.

174.    Pursuant to 20.2.70.200(A) NMAC, any major source must obtain an operating permit from NMED.

175.    Pursuant to 20.2.70.7 NMAC, an "operating permit" or "permit" (unless the context suggests otherwise) is defined as "any permit or group of permits covering a source that is issued, renewed, modified or revised pursuant to 20.2.70 NMAC."

176.    Pursuant to 20.2.70.7(T) NMAC, an "operator" is defined as "the person or persons responsible for the overall operation of a facility."

177.    Pursuant to 20.2.70.7(U) NMAC, an "owner" is defined as "the person or persons who own a facility or part of a facility."

178.    Pursuant to 20.2.70.300(A) NMAC, for each source required to obtain a state operating permit under 40 C.F.R.  Part 70, the owner or operator must submit a timely and complete permit application in accordance with 20.2.70.300 NMAC.  20.2.70.300(D) NMAC contains the content requirements for the permit application and states that it must provide all emissions information, calculations, and computations for the source and for each emissions unit, for all emissions of all air pollutants for which the source is major and all emissions of regulated air pollutants.

179.    Pursuant to 20.2.70.300(D)(5)(b) NMAC, the permit application must identify and describe all emission points in detail to establish the basis for applicability of state and federal requirements.

180.    Pursuant to 20.2.70.302(A)(5) NMAC, all permit terms and conditions which are required under the CAA or under any of its applicable requirements, including any provisions designed to limit a source's potential to emit, are enforceable by the EPA Administrator and citizens under the CAA.  The permit must specifically designate as not being federally enforceable under the CAA any terms or conditions included in the permit that are not required under the CAA or under any of its applicable requirements.

181.    Pursuant to 20.2.70.408 NMAC, any credible evidence can be used for the purpose of establishing whether a person has violated or is in violation of the terms or conditions of a permit issued pursuant to 20.2.70 NMAC, notwithstanding any other provision

in the New Mexico SIP approved by the EPA Administrator.  Compliance methods specified in the New Mexico SIP are presumptively credible evidence of whether a violation has occurred at the source. 20.2.70.408(A)(2) NMAC.

## VI.    Applicable Enforcement Provisions

182.    Section 113 of the CAA, 42 U.S.C. § 7413, authorizes EPA to commence a civil action for injunctive relief and/or civil penalties against any person who has violated any requirement or prohibition of the CAA or regulations promulgated thereunder, or who has violated any applicable permit or implementation plan.

183.    Any person, including an individual, corporation, or partnership, as defined in Section 302(e) of the CAA, 42 U.S.C. § 7602(e), who violates any requirement or prohibition in CAA Title I, Part A, is subject to, among other things, a civil penalty of up to $37,000 per day for each violation that occurred between January 13, 2009 and November 2, 2015, and $121,275 per day for each violation that occurred after November 2, 2015, where penalties are assessed on or after December 27, 2023.  *See* Section 113(b) of the CAA, 42 U.S.C. § 7413(b), as modified by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701 note, and most recently by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74 § 701, 129 Stat. 584, 599-601; *see also* 40 C.F.R. § 19.4, and 88 Fed. Reg. 89309, 89312 (December 27, 2023).

184.    Sections 74-2-12 and 74-2-12.1 of the AQCA authorize NMED to commence a civil judicial action for appropriate relief, including civil penalties and injunctive relief, against any person that has violated or is violating a requirement or prohibition of the AQCA, a

regulation promulgated pursuant to the AQCA, or a condition of a permit issued under the AQCA.

185.    A person who violates a provision of the AQCA or a regulation, permit condition, or emergency order adopted or issued pursuant to the AQCA may be assessed a civil penalty not to exceed $15,000 for each violation for each day during any portion of which the violation occurs.  NMSA § 74-2-12.1.

## GENERAL ALLEGATIONS

186.    At relevant times herein, Defendant has been the "owner or operator," within the meaning of the CAA and AQCA, of the Artesia Refinery.

187.    At all relevant times herein, the Artesia Refinery has been a "major emitting facility," a "source," a "stationary source," a "major stationary source," and a "major source" within the meaning of the CAA and AQCA, the NSPS program and regulations, the NESHAP program and regulations, the Title V program and regulations, and the New Mexico SIP that adopts, incorporates, and/or implements these programs and regulations.

188.    At all relevant times herein, the Artesia Refinery has had a Title V permit that has been issued by NMED.  The Title V permit, including all modifications and renewals, were issued by NMED under its EPA-approved Title V operating permits program, under NMED regulations implementing 42 U.S.C. §§ 7661 – 7661f.  NMED issued Defendant a Title V operating permit, Permit No. P051-R2, on May 5, 2015.  The permit was effective until NMED issued a permit renewal, Permit 051-R3, on December 31, 2020.  Permit 051-R3 is still in effect.

I.    **NSPS Applicability to Defendant and the Artesia Refinery (40 C.F.R. Part 60)**

189.    At all relevant times herein, Defendant has been the owner and operator of the Artesia Refinery, as defined in Section 111(a)(5), 42 U.S.C. § 7411(a)(5).

190.    At all relevant times herein, Defendant's Artesia Refinery has been a "stationary source" under Section 111(a)(3) of the CAA, 42 U.S.C. § 7411(a)(3), because it is a facility that emits or may emit an air pollutant, including multiple criteria and HAPs.

191.    At all relevant times herein, pursuant to 40 C.F.R. §§ 60.101a and 60.691, the Artesia Refinery has been a "petroleum refinery" under the NSPS, subject to the applicable standards for the petroleum refining sector at various NSPS Subparts, as discussed throughout this Complaint.

### A.  NSPS Subpart A – General Provisions

192.    At all times relevant herein, the Artesia Refinery's API Separator has been an "affected facility" under NSPS Subpart QQQ, and therefore must comply with both NSPS Subpart QQQ and Subpart A.

193.    Pursuant to 40 C.F.R. § 60.692-3(b), the API Separator must be equipped and operated with a closed vent system and control device.  The Artesia Refinery has equipped the API Separator with a D-829/D-830 Dual Carbon Canister System as a control device to control emissions.

194.    Pursuant to 40 C.F.R. § 60.11(d), Defendant must operate the API Separator and the D-829/D-830 Dual Carbon Canister System in a manner consistent with good air pollution control practices for minimizing emissions at all times.

### B.  NSPS Subpart Ja – Petroleum Refineries

195.    At all relevant times herein, the Artesia Refinery has had five steam-assisted, elevated flares:  North Flare (FL-400), South Flare (FL-401), Alky Flare (FL-403), and the GOH Flare (FL-404).  According to Defendant, all five of these flares were modified after June 24, 2008.

196.    Defendant accepted the applicability of NSPS Subpart J for the five flares in the 2002 Navajo CD, thereby requiring compliance with NSPS Subpart Ja by no later than November 11, 2015.

197.    The North Flare, South Flare, FCC Flare, and GOH Flare are required to comply with the monitoring requirements of 40 C.F.R. § 60.107a(a)(2).  The gas stream to the Alky Flare is inherently low in sulfur content and is not required to comply with the monitoring requirements of 40 C.F.R. § 60.107a(a)(2).

### C.  NSPS Subparts K, Ka, and Kb – Storage Vessels for Petroleum Liquids

198.    At all relevant times herein, Defendant's Artesia Refinery has "storage vessels" that are used to store "petroleum liquid" and "volatile organic liquids" that meet the applicability criteria of the rules based on their dates of construction, reconstruction, or modification.  Consequently, Defendant has several storage vessels at the Artesia Refinery subject to both NESHAP Subpart CC, discussed throughout this Complaint, and NSPS Subparts Ka and Kb.

199.    At all relevant times herein, Defendant maintained a tank applicability file providing a detailed analysis of regulatory applicability for each storage vessel at the Artesia Refinery.  Defendant evaluated NESHAP Subpart CC applicability using construction date, design capacity, maximum true vapor pressure for stored liquid, and the tank annual average HAP percent by weight to determine the Group 1 or Group 2 status of each storage vessel. Defendant evaluated NSPS Subparts K, Ka, and Kb applicability using the design capacity and construction, reconstruction, or modification dates.  For storage vessels subject to both NESHAP Subpart CC and NSPS Subparts K, Ka, or Kb, Defendant evaluated the overlap

provisions of 40 C.F.R. § 63.640(n) to determine the appropriate compliance requirements for each storage vessel.

200.    Based upon EPA's evaluation of Defendant's tank applicability file, tanks T-0737, T-0802, and T-0830 must comply with NSPS Subpart Kb.

**D.  NSPS Subparts GGG and GGGa – Equipment Leaks of VOC in Petroleum Refineries**

201.    As of May 1, 2016, Defendant voluntarily elected to comply with NSPS Subpart GGGa for all process units, regardless of whether those process units triggered NSPS Subpart GGGa applicability due to construction, reconstruction, or modification dates.

202.    Defendant's compliance election was captured in the first New Source Review ("NSR") permit issued by NMED after the date of Defendant's voluntary election on August 12, 2016.

203.    NSPS Subpart GGGa applies to all process units subject to Plaintiffs' claims.

204.    All process units subject to Plaintiffs' claims meet the definition of "affected facility" in 40 C.F.R. § 60.590a(a)(1).

**E.  NSPS Subpart QQQ – VOC Emissions from Petroleum Refinery Wastewater Systems**

205.    At all relevant times herein, the Artesia Refinery's Title V permit incorporates NSPS Subpart QQQ in two categories of equipment-specific requirements.

206.    The first category of equipment-specific requirements covers fugitive emission sources that are part of the Artesia Refinery's WWTS, such as individual drain systems and oil-water separators.  The WWTS's fugitive emission sources are located throughout the process unit areas in the Artesia Refinery.

207.    The second category of equipment-specific requirements covers the WWTS at the Artesia Refinery and, in addition to the fugitive emission sources in the first category, includes tanks that have NSPS Subpart QQQ applicability.

208.    Defendant must comply with all applicable requirements of NSPS Subpart QQQ for the affected facilities as designated in the Title V permit.

209.    The Artesia Refinery's individual drain systems are "affected facilities" under NSPS Subpart QQQ. Defendant's Artesia Refinery QQQ Compliance Manual contains inspection maps by process unit identifying individual drain system components to be incorporated into the NSPS Subpart QQQ compliance program.

210.    The Artesia Refinery's WWTS contains process drains and junction boxes, including Drain No. 80-PD-18 and the Master Box ("T-0845"), that are subject to NSPS Subpart QQQ. Drain No. 80-PD-18 and T-0845 are components of an individual drain system, thereby making the drain and junction box subject to the CAA.

211.    The Artesia Refinery's oil-water separators are "affected facilities" under NSPS Subpart QQQ. The Artesia Refinery's WWTS includes an oil-water separator, used to separate oil from wastewater using various processes and equipment. The Artesia Refinery's Title V permit details an aboveground oil-water separator ("API Separator") that is composed of two tanks, T-0894 and T-0895.

212.    As described in Defendant's Artesia Refinery QQQ Compliance Manual, once oily wastewater is processed through the API Separator, the recovered slop oil is sent to an oil storage tank for further processing, while the water effluent from the API Separator is sent on for water treatment.

213.    The Artesia Refinery's API Separator is subject to the requirements of NSPS Subpart QQQ and the CAA.

214.    The Artesia Refinery also utilizes additional equipment as part of the oil-water separator systems, including the in-ground stilling well ("T-844"), stormwater lift station ("T-846"), and the lift basin ("T-1").

215.    During dry weather, oily wastewater and stormwater first pass through the T-844 before going to the API Separator.  The Artesia Refinery uses T-846 and T-1 during high rain events, or a process upset, to avoid hydraulic overloading of the API Separator.  Flows are diverted to a stormwater surge tank after passing through T-846, and then the oily wastewater and stormwater are routed to T-1 to be processed at the API Separator.

216.    T-844, T-846, and T-1 are oil-water separators at the Artesia Refinery and subject to the requirements of NSPS Subpart QQQ and the CAA.

217.    In accordance with 40 C.F.R. § 60.692-3(b), the Artesia Refinery's API Separator must be equipped and operated with a closed vent system and control device that meets the requirements of 40 C.F.R. § 60.692-5.  The API Separator utilizes a vapor recovery system as the control device for VOC emissions.  Specifically, the API separator is equipped with a hard-piped closed vent system connected to the D-829/D-830 Dual Carbon Canister System.

218.    As described in the Artesia Refinery's Title V permit, the D-829/D-830 Dual Carbon Canister System is the control device for the API Separator, subject to the requirements of NSPS Subpart QQQ, making the federal standards applicable to that equipment.

219.    Defendant must comply with the recordkeeping requirements of 40 C.F.R. § 60.697 for the D-829/D-830 Dual Carbon Canister System.

## II.   NESHAP Applicability to Defendant and the Artesia Refinery (40 C.F.R. Part 61)

220.   At all relevant times herein, the Artesia Refinery has been a "petroleum refinery," as defined in 40 C.F.R. § 61.341, because it processes crude oil and petroleum distillates into petroleum products such as diesel, gasoline, and asphalt.

221.   As described in the Title V permit, the Artesia Refinery is subject to the requirements of BWON.

222.   The Artesia Refinery must comply with the applicable BWON reporting requirements, in accordance with 40 C.F.R. § 61.357.

223.   In April 2023, Defendant reported that the Refinery's total annual benzene quantity in 2022 exceeded 10 Mg, triggering its obligation to comply with the 6 BQ Compliance Option in 40 C.F.R. § 61.342(e) pursuant to the 2002 Navajo CD.

## III.   NESHAP for Source Categories Applicability to Defendant and the Artesia Refinery (40 C.F.R. Part 63)

224.   At all relevant times herein, the Artesia Refinery has been considered a "major source" for federal compliance purposes, in accordance with Section 112 of the CAA, 42 U.S.C. § 7412.

225.   The Artesia Refinery has "petroleum refining process units" used for producing transportation fuels, separating petroleum, and separating, cracking, reacting, or reforming intermediate petroleum streams.  These process units have "emission points," including storage vessels and equipment leaks associated with a petroleum refining process unit.

226.   As the owner and operator of the petroleum refining process units and related emission points at the Artesia Refinery, Defendant must comply with the NESHAP Subpart CC fenceline monitoring requirements.

227.    At all relevant times herein, the Artesia Refinery has "storage vessels" that are used to store organic liquids, as defined in NESHAP Subpart CC.  Several storage vessels at the Artesia Refinery are subject to both NESHAP Subpart CC and NSPS Subparts Ka and Kb, as discussed throughout this Complaint.

228.    At all times relevant herein, Defendant maintained a tank applicability file providing a detailed analysis of regulatory applicability for each storage vessel at the Artesia Refinery.

229.    Defendant evaluated NESHAP Subpart CC applicability using construction date, design capacity, maximum true vapor pressure for stored liquid, and the tank annual average HAP percent by weigh to determine the Group 1 or Group 2 status of each storage vessel.

230.    Defendant evaluated NSPS Subparts K, Ka, and Kb applicability using the design capacity and construction, reconstruction, or modification dates.

231.    For storage vessels subject to both NESHAP Subpart CC and NSPS Subparts K, Ka, or Kb, Defendant evaluated the overlap provisions of 40 C.F.R. § 63.640(n) to determine the appropriate compliance requirements for each storage vessel.

232.    According to Defendant's tank applicability file, Tanks T-0011, T-0056, T-0107, T-0401, T-0411, T-0412, T-0437, T-0439, T-0450, T-0821, and T-1225 are Group 1 storage vessels subject to the requirements of NESHAP Subpart CC.

233.    According to Defendant's tank applicability file, Tank T-0057 was a Group 1 storage vessel subject the requirements of NESHAP Subpart CC.  Prior to the filing of this Complaint, Tank T-0057 was removed from service and subsequently decommissioned in October 2022.

234. According to Defendant's tank applicability file, Tank T-0106 is a Group 2 storage vessel subject to the requirements of NESHAP Subpart CC.

235. Defendant determined that T-0011, T-0056, T-0107, T-0401, T-0412, T-0437, T-0439, T-0450, and T-1225 are Group 1 storage vessels with a maximum true vapor pressure less than 11.1 psia and elected to comply with NESHAP Subpart WW at each storage vessel, rather than NESHAP Subpart SS, in accordance with 40 C.F.R. § 63.660.

236. At all times relevant herein, Tanks T-0057, T-0106, T-0401, T-0411, T-0737, T-0802, and T-0821 had applicability under NESHAP Subpart CC and were required to be operated and maintained in a manner consistent with safety and good air pollution control practices for minimizing emissions.

237. At all times relevant herein, Defendant's five flares were used as control devices for NESHAP Subpart CC-regulated emission sources. Specifically, the flares are control devices for emission points from petroleum refinery process units. Therefore, Defendant must meet the NESHAP Subpart CC flare efficiency standards and flare monitoring requirements.

## IV. SIP Applicability to Defendant and the Artesia Refinery

238. At all relevant times herein, the Artesia Refinery must comply with the reporting obligations of 20.2.73.300(B)(1) NMAC because it has been issued a construction permit under 20.2.72 NMAC and emits more than 100 tons of total suspended particulate, $PM_{10}$, $PM_{2.5}$, sulfur dioxide, nitrogen oxides, carbon monoxide, or VOCs in any calendar year.

239. The Artesia Refinery also satisfies the conditions in 20.2.73.300(B)(1) – (2) NMAC because it emits or has the potential to emit 100 tons per year or more of $PM_{10}$, $PM_{2.5}$, sulfur dioxide, nitrogen oxides, carbon monoxide, or VOCs and is a major source of hazardous air pollutants under 20.2.70 NMAC (Operating Permits).

46

240.    Defendant is required to submit an annual emission report for the Artesia Refinery in compliance with the requirements of 20.2.73.300 NMAC.

241.    NMED issued Defendant an air quality permit on May 6, 2015, which was in effect during the pendency of the EPA investigation of the Artesia Refinery.

**V.    Title V Applicability to Defendant and the Artesia Refinery**

242.    At all relevant times herein, the Artesia Refinery has been a major source and Defendant is required to obtain an operating permit from NMED, in accordance with 20.2.70.7 NMAC.

243.    During the pendency of EPA and NMED investigation, Defendant was subject to an operating permit issued by NMED on May 6, 2015.

**CLAIMS FOR RELIEF**

**CLAIM 1**
**(Violations of Standards of Performance for Petroleum Refineries, NSPS Subpart Ja, Violations of Title V Permit Provisions that Implement and Enforce these Requirements)**

244.    Paragraphs 1 through 243 are re-alleged and incorporated by reference.

245.    From at least November 2015 and continuing thereafter, Defendant violated NSPS Subpart Ja, 40 C.F.R. § 60.103a(h), and its Title V permit by burning fuel gas containing $H_2S$ concentrations in excess of 162 ppmv at four of the Artesia Refinery's flares (North Flare, South Flare, FCC Flare, and GOH Flare), resulting in excess $SO_2$ emissions.

246.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Defendant is subject to injunctive relief and civil penalties of up to $121,275 for violations per day for each violation of the CAA occurring after November 2, 2015, where penalties are assessed on or after December 27, 2023.

247.    For the violations asserted in this Claim, pursuant to Section 74-2-12.1(A) of the AQCA, Defendant is liable to NMED for injunctive relief and civil penalties of up to $15,000 per day for each violation.

### CLAIM 2
**(Violations of Standards of Performance for Volatile Organic Liquid Storage Vessels (Including Petroleum Liquid Storage Vessels), NSPS Subpart Kb, Violations of Title V Permit Provisions that Implement and Enforce these Requirements)**

248.    Paragraphs 1 through 243 are re-alleged and incorporated by reference.

249.    Tanks T-0737, T-0802, and T-0830 meet the design capacity and maximum true vapor pressure criteria in 40 C.F.R. § 60.112b and therefore, must be equipped with one of the control options in 40 C.F.R. § 60.112b(a)(1) – (4).

250.    The three storage vessels were equipped with external floating roofs, which must comply with the seal gap inspection requirements in 40 C.F.R. § 60.113b(b).

251.    From at least January 2017 through October 2019, Defendant violated NSPS Subpart Kb, 40 C.F.R. § 60.113b(b)(2), and its Title V permit by failing to determine gap widths and gap areas in the primary and secondary seals on the floating roofs of three tanks at the Artesia Refinery, in accordance with applicable procedures.

252.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Defendant is subject to injunctive relief and civil penalties of up to $121,275 for violations per day for each violation of the CAA occurring after November 2, 2015, where penalties are assessed on or after December 27, 2023.

253.    For the violations asserted in this Claim, pursuant to Section 74-2-12.1(A) of the AQCA, Defendant is liable to NMED for injunctive relief and civil penalties of up to $15,000 per day for each violation.

**CLAIM 3**
**(Violations of Standards of Performance for Equipment Leaks of VOC in Petroleum Refineries, NSPS Subpart GGGa, Violations of Title V Permit Provisions that Implement and Enforce these Requirements)**

254.    Paragraphs 1 through 243 are re-alleged and incorporated by reference.

255.    Affected facilities under NSPS Subpart GGGa are subject to applicable requirements of NSPS Subpart VVa.

256.    On at least four occasions from April 2016 through May 2017, Defendant violated NSPS Subpart GGGa, 40 C.F.R. § 60.592a(a), NSPS Subpart VVa, 40 C.F.R. § 60.482-2a(c)(1), and its Title V permit by failing to repair pumps at four NSPS Subpart GGGa affected facilities (Process Units FUG-13-NHDU, FUG-25-ROSE 2, FUG-29-BLENDER/TK FARM, and FUG-LPG) within 15 calendar days of detecting a leak due to invalid delay of repair.

257.    On at least seven occasions from February 2017 through August 2019, Defendant violated NSPS Subpart GGGa, 40 C.F.R. § 60.592a(a), NSPS Subpart VVa, 40 C.F.R. § 60.482-2a(c)(2), and its Title V permit by failing to make a first attempt at repair within five calendar days of detecting a leak at pumps at four separate NSPS Subpart GGGa affected facilities (Process units FUG-06-NHDU, FUG-09-N ALKY, FUG-13-NHDU, and FUG-29-BLENDER/TK FARM).

258.    On at least two occasions from September 2016 through October 2018, Defendant violated NSPS Subpart GGGa, 40 C.F.R. § 60.592a(a), NSPS Subpart VVa, 40 C.F.R. § 60.482-2a(e)(2), and its Title V permit by failing to operate pumps with no detectable emissions in NSPS Subpart GGGa affected facilities (Process units FUG-31-SRU3/TGTU3/TGI3 and FUG-70-CCR), as indicated by an instrument reading of less than 500 ppm above background.

259.    On at least one occasion in October 2017, Defendant violated NSPS Subpart GGGa, 40 C.F.R. § 60.592a(a), NSPS Subpart VVa, 40 C.F.R. § 60.482-4a(a), and its Title V permit by failing to operate a pressure relief device in a NSPS Subpart GGGa affected facility (FUG-02-SP CRUDE) with no detectable emissions, as indicated by an instrument reading of less than 500 ppm above background.

260.    On at least nine occasions from April through May 2019, Defendant violated NSPS Subpart GGGa, 40 C.F.R. § 60.592a(a), NSPS Subpart VVa, 40 C.F.R. § 60.482-6a(a)(1), and its Title V permit by failing to equip open-ended lines with a cap, blind flange, plug, or a second valve at four NSPS Subpart GGGa affected facilities (Process units FUG-07-N AMINE, FUG-13-NHDU, FUG-35-SAT GAS, and FUG-44-DIST-HDU).

261.    On at least one occasion in April 2019, Defendant violated NSPS Subpart GGGa, 40 C.F.R. § 60.592a(a), NSPS Subpart VVa, 40 C.F.R. § 60.482-7a(a)(2)(i), and its Title V permit by failing to monitor a valve in gas/vapor service or light liquid service at NSPS Subpart GGGa affected facility process unit FUG-41-PBC using Method 21.

262.    On at least six occasions from January 2018 through July 2019, Defendant violated NSPS Subpart GGGa, 40 C.F.R. §§ 60.592a(a), NSPS Subpart VVa, 40 C.F.R. § 60.482-7a(c)(1)(i), and its Title V permit, by failing to conduct monthly monitoring on a valve prior to monitoring on a quarterly basis and by failing to monitor valves on a quarterly basis in NSPS Subpart GGGa affected facilities process units FUG-10-FCC and FUG-54-PRIMEG.

263.    On at least six occasions from June 2017 through April 2019, Defendant violated NSPS Subpart GGGa, 40 C.F.R. § 60.592a(a), NSPS Subpart VVa, 40 C.F.R. § 60.482-7a(d), and its Title V permit by failing to make a first attempt at repair within five calendar days of

detecting a leak at valves at five separate NSPS Subpart GGGa affected facilities (process units FUG-06-NHDU, FUG-25-ROSE 2, FUG-35-SAT GAS, FUG-41-PBC, and FUG-70-CCR).

264.    On at least 18 occasions from April 2017 through May 2019, Defendant violated NSPS Subpart GGGa, 40 C.F.R. § 60.592a(a), NSPS Subpart VVa, 40 C.F.R. § 60.482-7a(d)(1), and its Title V permit by failing to repair valves within 15 calendar days of detecting a leak at eight NSPS Subpart GGGa affected facilities (process units FUG-02-SP CRUDE, FUG-06-NHDU, FUG-09-N ALKY, FUG-10-FCC, FUG-13-NHDU, FUG-33-DIST HDU, FUG-34-HYDROCRACKER, and FUG-70-CCR).

265.    On at least eight occasions from March 2017 to May 2019, Defendant violated NSPS Subpart GGGa, 40 C.F.R. § 60.592a(a), NSPS Subpart VVa, 40 C.F.R. § 60.482-7a(d)(1), and its Title V permit by failing to repair valves at five NSPS Subpart GGGa affected facilities (process units FUG-10-FCC, FUG-31-SRU3/TGTU3/TGI3, FUG-35-SAT GAS, FUG-44-DIST-HDU, and FUG-SRU1/SRU2/TGTU) within 15 calendar days of detecting a leak due to invalid delay of repair.

266.    On at least two occasions in September 2015, Defendant violated NSPS Subpart GGGa, 40 C.F.R. § 60.592a(a), NSPS Subpart VVa, 40 C.F.R. § 60.482-7a(f)(2), and its Title V permit by failing to operate valves with no detectable emissions, as indicated by an instrument reading of less than 500 ppm above background in NSPS Subpart GGGa affected facilities process units FUG-02-SP CRUDE and FUG-34-HYDROCRACKER.

267.    On at least three occasions in September 2019, Defendant violated NSPS Subpart GGGa, 40 C.F.R. § 60.592a(a), NSPS Subpart VVa, 40 C.F.R. § 60.482-10a(f)(1)(i), and its Title V permit by failing to conduct an initial inspection on the closed vent systems at NSPS

Subpart GGGa affected facility (process unit FUG-44-DIST-HDU) in accordance with 40 C.F.R. § 60.485a(b).

268.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Defendant is subject to injunctive relief and civil penalties of up to $121,275 for violations per day for each violation of the CAA occurring after November 2, 2015, where penalties are assessed on or after December 27, 2023.

269.    For the violations asserted in this Claim, pursuant to Section 74-2-12.1(A) of the AQCA, Defendant is liable to NMED for injunctive relief and civil penalties of up to $15,000 per day for each violation.

## CLAIM 4
### (Violations of Standards of Performance for VOC Emissions from Petroleum Refinery Wastewater Systems, NSPS Subpart QQQ, Violations of Title V Permit Provisions that Implement and Enforce these Requirements)

270.    Paragraphs 1 through 243 are re-alleged and incorporated by reference.

271.    Defendant violated, or continues to violate, NSPS Subpart QQQ, 40 C.F.R. § 60.692-2(a)(1), and its Title V permit by operating at least 125 drains without required controls, beginning prior to January 2024; by operating Drain No. 80-PD-18 without a water seal control, beginning prior to December 2019 through January 2020; and, by operating at least 200 catch basins without water seals to control VOC emissions from the oily water sewer, beginning prior to July 2018 through December 2020.

272.    Beginning in December 2019 through January 2020, Defendant violated NSPS Subpart QQQ, 40 C.F.R. § 60.692-2(a)(5), and its Title V permit by failing to perform a first effort to repair Drain No. 80-PD-18 within 24 hours after detection of low water levels or missing or improperly installed caps or plugs.

273.    Defendant violated, or continues to violate, NSPS Subpart QQQ, 40 C.F.R. § 60.692-2(b), and its Title V permit by operating at least 40 junction boxes without a cover or tight seal, beginning prior to January 2024; by operating the junction box adjacent to the West API Separator without a tight seal, beginning prior to June 2023 through August 2023; and by operating T-0845 without a cover or tight seal, beginning prior to December 2019 through January 2020.

274.    Beginning in December 2019 through January 2020, Defendant violated NSPS Subpart QQQ, 40 C.F.R. § 60.692-2(b)(4), and its Title V permit by failing to perform a first effort to repair the T-0845 cover within 15 calendar days after visual gaps or cracks were identified on December 18, 2019.

275.    Beginning prior to October 2019 through January 2020, Defendant violated NSPS Subpart QQQ, 40 C.F.R. § 60.692-3(a), and its Title V permit by failing to ensure that access doors or openings on the roof of the T-846 Stormwater Lift Station and T-1 Lift Basin were gasketed, latched, and kept closed at all times during operation of the separator system, except during inspection and maintenance.

276.    Beginning in December 2019 through January 2020, Defendant violated NSPS Subpart QQQ, 40 C.F.R. § 60.692-3(a)(5), and its Title V permit by failing to perform a first effort to repair the T-1 Lift Basin's access hatch gasket within 15 calendar days of identification of the broken seal or gasket.

277.    Beginning prior to October 2019 through February 2024, Defendant violated NSPS Subpart QQQ, 40 C.F.R. § 60.692-3(b), and its Title V permit by operating the API Separator, which has a design capacity to treat more than 250 gallons per minute, without a closed vent system and control device that meets the requirements of 40 C.F.R. § 60.692-5.

278.   Beginning prior to October 2019 through February 2024, Defendant violated NSPS Subpart QQQ, 40 C.F.R. § 60.692-5(e)(3), and its Title V permit by failing to install a flow indicator on the vent stream from the API Separator to the D-829/D-830 Dual Carbon Canister System control device to ensure that vapors are being routed to the device.

279.   Beginning prior to September 2021 through August 2023, Defendant violated NSPS Subpart QQQ, 40 C.F.R. § 60.697(b)(1), and its Title V permit by failing to maintain records at least 35 times of the date and corrective action when a water seal on a drain was discovered to be dry or otherwise breached during periodic visual or physical inspection.

280.   Beginning prior to December 2019 through October 2020, Defendant violated NSPS Subpart QQQ, 40 C.F.R. § 60.697(f)(1), and its Title V permit by failing to maintain a copy of the design specifications for the D-829/D-830 Carbon Canister System in a readily accessible location for the life of the canister system.

281.   For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Defendant is subject to injunctive relief and civil penalties of up to $121,275 for violations per day for each violation of the CAA occurring after November 2, 2015, where penalties are assessed on or after December 27, 2023.

282.   For the violations asserted in this Claim, pursuant to Section 74-2-12.1(A) of the AQCA, Defendant is liable to NMED for injunctive relief and civil penalties of up to $15,000 per day for each violation.

## <u>CLAIM 5</u>
**(Violations of the National Emission Standard for Benzene Waste Operations, NESHAP Subpart FF, Violations of Title V Permit Provisions that Implement and Enforce these Requirements)**

283.   Paragraphs 1 through 243 are re-alleged and incorporated by reference.

284.    Defendant violated, and continues to violate, BWON, 40 C.F.R. § 61.342(e), and its Title V permit by failing to maintain its annual benzene quantity for uncontrolled benzene-containing wastes equal to or less than 6.0 Mg/year since at least 2022.

285.    From at least January 2016 through December 2021, Defendant violated BWON, 40 C.F.R. §§ 61.355(a) and 61.357(d)(5), and its Title V permit by failing to accurately calculate the total annual benzene quantity for the Artesia Refinery by omitting from its waste stream inventory at least 25 slop oil waste streams directed to tank T-437.

286.    From at least 2022, Defendant violated and continues to violate BWON, 40 C.F.R. §§ 61.346(a)(1)(i)(A) and 61.347(a)(1)(i)(A), and its Title V permit by failing to operate the cover and all openings on multiple individual drain systems and oil water separators, including the API Separator, with no detectable emissions.

287.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Defendant is subject to injunctive relief and civil penalties of up to $121,275 for violations per day for each violation of the CAA occurring after November 2, 2015, where penalties are assessed on or after December 27, 2023.

288.    For the violations asserted in this Claim, pursuant to Section 74-2-12.1(A) of the AQCA, Defendant is liable to NMED for injunctive relief and civil penalties of up to $15,000 per day for each violation.

### CLAIM 6
**(Violations of National Emissions Standards for Hazardous Air Pollutants from Petroleum Refineries, NESHAP Subpart CC, National Emissions Standards for Storage Vessels (Tanks) – Control Level 2, NESHAP Subpart WW, Violations of Title V Permit Provisions that Implement and Enforce these Requirements)**

289.    Paragraphs 1 through 243 are re-alleged and incorporated by reference.

290.    From at least January 2017 and continuing thereafter, on various occasions, Defendant violated NESHAP Subpart CC, 40 C.F.R. § 63.642(n), and its Title V permit by failing to operate and maintain seven tanks (T-0057, T-0106, T-0401, T-0411, T-0737, T-0802, and T-0821) at the Artesia Refinery, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions.

291.    From at least February 2019  and continuing thereafter, Defendant violated the NESHAP Subpart CC, 40 C.F.R. § 63.658(g) and (h), requirement to determine and implement an appropriate corrective action to reduce fenceline benzene annual average concentration below 9 µg/m3, resulting in excess benzene and other VOC emissions.

292.    From at least September 2020 through December 2021, Defendant violated NESHAP Subpart CC, 40 C.F.R. § 63.660, NESHAP Subpart WW, 40 C.F.R. § 63.1063(a)(2), and its Title V permit by failing to comply with the deck fittings design requirements in 40 C.F.R. § 63.1063(a)(2)(i) – (viii) for six tanks (T-0011, T-0056, T-0107, T-0412, T-0439, and T-0450) at the Artesia Refinery.

293.    In October 2019, Defendant violated NESHAP Subpart CC, 40 C.F.R. § 63.660, NESHAP Subpart WW, 40 C.F.R. § 63.1063(b)(1), and its Title V permit by failing to maintain the external floating roof of tank T-0401 on the liquid surface at all times.

294.    From at least January 2017 through October 2019, Defendant violated NESHAP Subpart CC, 40 C.F.R. § 63.660, NESHAP Subpart WW, 40 C.F.R. § 63.1063(d)(3)(i), and its Title V permit by failing to determine gap widths and gap areas in the primary and secondary seals on the floating roofs of three tanks (T-0412, T-0437, and T-1225) at the Artesia Refinery, in accordance with applicable procedures.

295.    From at least January 2019 and continuing thereafter, Defendant violated NESHAP Subpart CC, 40 C.F.R. § 63.670(e), by failing to meet the combustion zone operating limits for the Artesia Refinery's five flares (North Flare, South Flare, FCC Flare, Alky Flare, and GOH Flare), resulting in excess VOC emissions.

296.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Defendant is subject to injunctive relief and civil penalties of up to $121,275 for violations per day for each violation of the CAA occurring after November 2, 2015, where penalties are assessed on or after December 27, 2023.

297.    For the violations asserted in this Claim, pursuant to Section 74-2-12.1(A) of the AQCA, Defendant is liable to NMED for injunctive relief and civil penalties of up to $15,000 per day for each violation.

## CLAIM 7
### (Violations of the New Mexico SIP)

298.    Paragraphs 1 through 243 are re-alleged and incorporated by reference.

299.    In April 2017, Defendant violated 20.2.73.300(B) NMAC of the federally enforceable New Mexico SIP by failing to submit to NMED a complete, correct, and current emissions inventory report for reporting year 2016 because Defendant did not report any benzene emissions.

300.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Defendant is subject to injunctive relief and civil penalties of up to $121,275 for violations per day for each violation of the CAA occurring after November 2, 2015, where penalties are assessed on or after December 27, 2023.

301.    For the violations asserted in this Claim, pursuant to Section 74-2-12.1(A) of the AQCA, Defendant is liable to NMED for injunctive relief and civil penalties of up to $15,000 per day for each violation.

**CLAIM 8**
**(Violations of the Title V Operating Permit)**

302.    Paragraphs 1 through 243 are re-alleged and incorporated by reference.

303.    From at least reporting years 2016 through 2019, Defendant violated the terms and conditions of the Title V permit, Permit No. P051-R2, and thus violated Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and 20.2.70.302(A)(5) NMAC, by emitting air contaminants in excess of emission limits specified in the Artesia Refinery's Title V Permit for cooling Towers Y-0011 and Y-0012.

304.    From at least reporting years 2015 through 2016, Defendant violated the terms and conditions of Title V permit, Permit No. P051-R2, and thus violated Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and 20.2.70.302(A)(5) NMAC, by failing to follow the throughput and emissions limits in the permit.

305.    From at least May 2019 and continuing thereafter, Defendant violated Section 503(c) of the CAA, 42 U.S.C. § 7661b(c); 40 C.F.R. § 70.5(a) and (c); and 20.2.70.300(D)(5) NMAC by failing to provide all emissions information in its permit application for several tanks because Defendant underrepresented the number of deck legs at several tanks based on the estimate of deck legs provided in other documentation, resulting in an undercalculation of the potential to emit at each of the tanks.

306.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Defendant is subject to injunctive relief and civil penalties of up to $121,275 for violations per day for each

violation of the CAA occurring after November 2, 2015, where penalties are assessed on or after December 27, 2023.

307.    For the violations asserted in this Claim, pursuant to Section 74-2-12.1(A) of the AQCA, Defendant is liable to NMED for injunctive relief and civil penalties of up to $15,000 per day for each violation.

## CLAIM 9
### (Violations of Standards of Performance for New Stationary Sources General Provisions, NSPS Subpart A, Violations of Title V Permit Provisions that Implement and Enforce these Requirements)

308.    Paragraphs 1 through 243 are re-alleged and incorporated by reference.

309.    From at least October 2019 and continuing thereafter, Defendant violated NSPS Subpart A, 40 C.F.R. § 60.11(d), and its Title V permit by failing to ensure that the oil-water separators and associated air pollution control devices are maintained and operated in a manner consistent with good air pollution control practice for minimizing emissions.

310.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Defendant is subject to injunctive relief and civil penalties of up to $121,275 for violations per day for each violation of the CAA occurring after November 2, 2015, where penalties are assessed on or after December 27, 2023.

311.    For the violations asserted in this Claim, pursuant to Section 74-2-12.1(A) of the AQCA, Defendant is liable to NMED for injunctive relief and civil penalties of up to $15,000 per day for each violation.

## PRAYER FOR RELIEF

WHEREFORE, based on the above allegations, Plaintiffs request that this Court:

A.    Permanently enjoin Defendant from further violating the CAA, the AQCA, the regulations implementing those statutes, and all applicable permits;

B.    Order Defendant to take appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the CAA, the AQCA, regulations implementing those statutes, and all applicable permits;

C.    Assess a civil penalty against Defendant for each violation of the CAA, its implementing regulations, the New Mexico SIP, and the applicable federally enforceable permits of up to $121,275 per day for each violation occurring on or after November 2, 2015;

D.    Assess a civil penalty against Defendant for each violation of the AQCA, its implementing regulations, and all applicable state-issued permits of up to $15,000 per day for each violation; and

E.    Grant such other and further relief as the Court deems just and proper.


**FOR THE UNITED STATES OF AMERICA:**

KATHERINE E. KONSCHNIK
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


SCOTT M. CERNICH (D.C. Bar No. 479851)
Senior Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Benjamin Franklin Station
Washington, DC 20044-7611
(202) 514-0056
scott.cernich@usdoj.gov

Attorney for Plaintiff United States of America

60

ALEXANDER M.M. UBALLEZ
United States Attorney

RUTH F. KEEGAN
Assistant United States Attorney
District of New Mexico
P.O. Box 607
Albuquerque, NM 87103
(505) 224-1470
Ruth.F.Keegan@usdoj.gov

OF COUNSEL:
PROVIDENCE SPINA
Attorney-Advisor
Air Enforcement Division
Office of Civil Enforcement
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460
(202) 564-2722
spina.providence@epa.gov

ARATI TRIPATHI
Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency
Region 6
1201 Elm Street, Suite 500
Dallas, Texas 75270
(214) 665-7404
tripathi.arati@epa.gov

**FOR THE NEW MEXICO ENVIRONMENT DEPARTMENT:**

JAMES C. KENNEY
Cabinet Secretary
New Mexico Environment Department
1190 St. Francis Dr., Suite N4050
Santa Fe, New Mexico 87501
(505) 470-6161
james.kenney@state.nm.us

_____
CHRIS VIGIL (NM Bar # 141937)
Special Assistant Attorney General
New Mexico Environment Department
121 Tijeras Ave. NE, Suite 1000
Albuquerque, New Mexico 87102
(505) 469-4696
christopherj.vigil@env.nm.gov

Attorney for Plaintiff New Mexico Environment
Department